FILED
2020 Nov-12  PM 11:49
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **JOSHUA OTWELL, an individual,** | ) | |
| **DANNA LEE OTWELL, an individual,** | ) | |
| | ) | **Civil Action No.:** |
| **Plaintiffs,** | ) | |
| | ) | **4:19-cv-01120-ACA** |
| **v.** | ) | |
| | ) | |
| **HOME POINT FINANCIAL CORP., a Corporation;** | ) | |
| | ) | |
| **Defendant.** | ) | |

## RESPONSE IN OPPOSITION TO DEFENDANT HOME POINT FINANCIAL CORP.'S MOTION FOR SUMMARY JUDGMENT [DOC. 28]

Respectfully Submitted,

/s/ M. Stan Herring
**John G. Watts (ASB-5819-t82j)**
**M. Stan Herring (ASB-1074-n72m)**
**Watts & Herring, LLC**
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 879-2447
(888) 522-7167 *facsimile*
john@wattsherring.com
stan@wattsherring.com
**Attorneys for Plaintiffs**

1

## **Table of Contents**

**Table of Contents**     **2**

**Statement of Facts**     **3**

**A. Response to Movant's Statement of Undisputed Material Facts**     **3**

**B. Respondents Joshua and Danna Lee Otwell's Additional Undisputed Facts**     **5**

**Legal Argument**     **16**

**Introduction**     **16**

   **A. Count I - Violations of RESPA**     **18**

   **B. Count II – Violations of the Fair Debt Collections Practice Act (FDCPA)**     **22**

   **C. Count III – Negligent or Wanton Supervision**     **31**

   **D. Count IV – Negligent and/or Wanton Conduct**     **31**

   **E. Count V - Invasion of Privacy**     **31**

   **F. Count VI – Fraud or Fraudulent Suppression**     **32**

**Conclusion**     **32**

## Statement of Facts

### A.  Response to Movant's Statement of Undisputed Material Facts

**Movant's Fact #7:** "The Litigation remained active for more than a year, until August 2018, when Home Point offered to resolve the dispute by giving the Otwells a three-month Trial Payment Plan in order to qualify them for an FHA Partial Claim - a repayment plan that allows defaulting borrowers to reinstate their loan by deferring the past due balance owed to the end of the loan, interest free."

**Dispute:**     The Otwells were not provided with a modification or repayment plan as described above. They were provided with what appears to have been a new loan with a completely separate entity HUD, with payments going to Office of Housing FHA-Comptroller, that had no payment terms, no monthly payment amounts and did not in any way address the underlying principle of the original loan, which amounted to $200K at the time. Despite repeated attempts to clarify what exactly was being offered and the terms, neither Home Point nor its counsel at the time responded until it was too late. [Doc. 26-10, p.2] (Doc 32-1, p3-4; Doc. 32-2)

**Movant's Fact #10:**      On December 14, 2018, Home Point provided the Otwells a Loan Modification Package, consisting of a promissory note, subordinate mortgage, and other documents designed to secure, and defer the Otwells' past due balance to the end of their loan, interest free."

**Dispute:**   Plaintiff contests that this was in fact a Loan Modification Package. [Doc. 26-10]

**Movant's Fact #11:**   "The Otwells did not sign or return any part of the Loan Modification Package to Home Point."

**Dispute:**   Plaintiff contests that this was in fact a Loan Modification Package. [Doc. 26-10].

**Movant's Fact #10:**   "Because the Loan Modification was not signed and returned, and because the past-due balance was not otherwise cured, beginning in February 2019, Home  Point resumed standard default noticing to the Otwells, in due course, providing the required foreclosure notices."

**Dispute:**   Plaintiffs dispute that what was sent was an actual loan modification. [See Doc. 26-10]. Home Point did send a default notice to the Otwells in February 2019. However, Home Point did not send the "required foreclosure notices" as it did not send an acceleration letter to the Otwells and the alleged default notice is defective in a variety of ways. The mortgage states in paragraph 18 that "If Lender requires immediate payment in full under paragraph 9, Lender may invoke the power of sale and other remedies permitted by law." [Doc. 26-3 p. 6] Paragraph 9 , "Grounds for Acceleration" states the circumstances under which Home Point can "require immediate payment in full for sums secured by this Security Instrument…"

[Doc. 26-3 p. 4]   However, no such "immediate payment" was demanded under paragraph 9 of the mortgage. (Doc. 32-1, p. 5-6)

**B.    Respondents Joshua and Danna Lee Otwell's Additional Undisputed Facts**

1.    When Stonegate Mortgage Corporation was assigned the loan and mortgage on August 11, 2016, the Otwells were already behind on their payments, as reflected in the monthly mortgage statement dated October 16, 2018, which shows that the loan was due for the February 1, 2016 payment. [Doc. 26-11 p. 1]

2.    The Note and Mortgage were assigned to Stonegate Mortgage Corporation on August 11, 2016. [Doc. 26-4, p.1]

3.    Despite the fact that Stonegate ceased to exist as of May 2017 and no longer owned plaintiff's loan, it somehow still filed a lawsuit against Plaintiffs on June 30, 2017 representing to the Alabama court that it owned plaintiff's loan. [Doc. 26-6 at p.3, ¶ 8]

4.    As a part of the settlement of that lawsuit, Home Point Financial stated that it was offering a modification of the Loan. (Doc. 32-2, p.10-11)

5.    Instead, Home Point sent Plaintiffs a letter dated August 24, 2018 telling them they may be available for an FHA Partial Claim. [Doc. 26-9 p.1]

6.    Other than telling the Plaintiffs that they had to make three trial plan payments and when, the letter offered no details of the terms of the modification, what other

modification options for which they had been considered and what other modification options for which they had been rejected.  [Doc. 26-9 p.1]

7.   The August 24th letter stated that the only requirement to be offered a modification was making the three payments. No where did Home Point mention that Plaintiffs had to submit an additional application, submit additional or updated financial information or any of the other information normally required. [Doc. 26-9 p.1]

8.   The Plaintiffs entered into a Trial Payment Plan with Defendant on or about September 14, 2018 and made all of the payments pursuant to the Trial Payment Plan ($1609.27 on October 1, 2018, November 1, 2018, and December 1, 2018). (Doc. 32-1, p.3)

9.   Even after making the required payments under the Trial Payment Plan (TPP), Plaintiffs continued to make the payments in January, February and March 2019 until Home Point started rejecting the payments. (Doc.32-9)

10.   In December, Plaintiffs received a FedEx envelope that contained a group of documents that included a Promissory Note and Partial Claim Mortgage that showed us as the borrower and the Secretary of Housing and Urban Development as the Lender. (Doc. 32-1, p.3-4)

11.   It showed that we were taking out a loan in the amount of $60,891.81. (Doc. 32-1, p.3-4)(Doc. 26-10, p.2)

12.    The Otwells did not understand what this was, as it did not tell us how much our monthly payments would be or when the monthly payments were due, but only showed a balloon payment due on or before February 1, 2045. (Doc. 26-10 p.2-3; (Doc. 32-1, p.4)

13.    The Note did not explain how our loan with Homepoint with an outstanding principal balance of $231,674 was being handled or modified or whether it had been forgiven or whether we had to make those payments in addition to the balloon payment due in 2045. (Doc. 26-10 p.2-3; Doc. 32-1, p.4); Doc. 26-11.)

14.     Plaintiffs were confused by this, as we did not know if or how the Secretary of Housing and Urban Development was related to Home Point and if this was supposed to be the modification.  (Doc. 32-1, p.4)

15.    The Promissory Note also had us making payments to the Office of Housing FHA-Comptroller in Washington, D.C. This was also confusing as we did not know who this was, nor what they had to do with Home Point or our loan or modification. (Doc. 26-10 p.2-3; Doc. 32-1, p.4)

16.    Shortly after receiving the FedEx package, we contacted our lawyers' office and forwarded the package to their assistant Randi Curb.( Doc. 32-1, p.4)

17.    On January 4, 2019 Ms. Curb reached out to the lawyers for Stonegate/Home Point at the time and asked what had been sent and for an explanation, but received no response.( Doc. 32-1, p.4; Doc. 32-2, p.4)

18.     Ms. Curb again emailed the lawyers for an explanation on January 8, 2019 and again received no response.( Doc. 32-1, p.4; Doc. 32-2, p.3-4)

19.     Even though Home Point knew we were represented by counsel, on February 19, 2019 we received a letter from Home Point supposedly denying us a loan modification, stating "Based on a careful review of the information you provided to us, you are unfortunately ineligible for a loss mitigation retention option. Our review of your financial and other information indicates that although you may have a hardship, you do not qualify for a modification." (Doc. 32-1,p.4-5; Doc. 32-3,p. 2)

20.     When Ms. Curb finally received a response from Stonegate/Home Point's lawyers on March 28, 2019, she was informed that Plaintiffs needed to deal directly with their client in regards to the modification. ( Doc. 32-1, p.4; Doc. 32-2, p.2-3)

21.     On February 21, 2019, Defendant Home Point sent a letter to Plaintiffs informing them that they were in default on their loan. [Doc. 26-12]

22.     The letter noted that if Plaintiffs did not pay $60,255.29 by March 26, 2019, then this "may result in acceleration of all sums due . . ."[Doc. 26-12, p1.]

23.     Thus, acceleration was not stated to have happened or that it would happen – instead that it was merely a possibility. [Doc. 26-12, p1.]

24.     Plaintiffs did not receive an acceleration letter prior to the foreclosure. (Doc. 32-1, p.5)

25.     The February 21, 2019 default letter states that "You have the right to assert in any foreclosure proceeding, the non existence of a default or any other defense you have." [Doc. 26-12, p. 1]

26.     Defendant Home Point (through Rubin Lublin) wrote to Plaintiffs directly on April 15, 2019, when Defendant Home Point knew Plaintiffs were represented by counsel. [Doc. 26-12, p.3]

27.     In the April 15, 2019 letter Home Point through its lawyers falsely tells the Otwells, "We do not believe that you are represented by counsel," when in fact they knew the Otwells were represented by counsel. [Doc. 26-12, p4]; Doc. 32-1, p. 6; Doc. 32-5, p.3]

28.     The April 15th letter also told us that we had thirty (30) days to notify them that we disputed the validity of the debt and stated that if we notified the lawyers in writing requesting verification of the debt that they would mail it to us and would also provide the name and address of the original lender. [Doc. 26-12, p4]

29.     The April 15 letter also contained the foreclosure advertising notice and stated that the foreclosure sale would take place on June 13, 2019. [Doc. 26-12, p4]

30.     In response to the April 15, 2019 letter, we sent a dispute to Home Point's lawyers on April 25, 2019 at their address stated in the letter, 100 Concourse parkway, Suite 115, Birmingham, AL 35244, informing that we believed the information in the letter was in error, wanting to know what exactly the indebtedness

was, and requesting that they cancel the foreclosure and investigate and verify the debt under the FDCPA. (Doc.32-6, p.2)

31.     We then received a letter in response from Home Point (through counsel at Rubin Lublin) dated June 7, 2019.  The letter says we would receive the loan payment history but it left out 2018.  And then it had language about the FDCPA might not apply and what the FDCPA required Homepoint to do when doing a verification. (Doc. 32-7 and 32-8)

32.     Defendant Home Point sent a letter directly to Plaintiffs despite knowing they were represented by counsel again on July 16, 2019, demanding payment. (Doc. 33-1, p.2-3)

33.     There was no acceleration letter.

34.     The loan has not been accelerated.

35.     The mortgage states in paragraph 18 that "If Lender requires immediate payment in full under paragraph 9, Lender may invoke the power of sale…"  [Doc. 26-3, p. 4, 6]

36.     No such "immediate payment" was demanded under paragraph 9 of the mortgage. [Doc. 26-3, p. 4, 6](Doc. 32-1, p. 5)

37.     Josh Otwell's credit reports show this account being updated but not showing it as being disputed even though I disputed this debt in my letter and in this lawsuit. (Doc.32-1, p. 7; Doc. 33-1, p.5-14)

38.    For example, in August 2019, Otwell's Equifax report shows Home Point updating my credit report on August 5, 2019, but not showing it as disputed. (Doc. 33-1, p.5-8)

39.    The same is true on my Experian report with an update on August 5, 2019, but no indication of the account being marked as disputed. (Doc. 33-1, p.10-12)

40.    TransUnion was also updated by Homepoint on August 5, 2019, without a dispute notification. (Doc. 33-1, p.14)

41.    The actions of Home Point in their refusal to properly consider us for a modification, send us a new loan without explanation,  sending us a false default letter, contacting us instead of our lawyers, and then claiming Plaintiffs were denied a modification for financial reasons and then proceed toward foreclosure have caused me to suffer mental anguish and emotional distress. (Doc. 32-1, p7-8)

42.    Home Point and its lawyer's actions in trying to take Plaintiffs' home have caused them embarrassment with the posting of door hangers and publicly advertising a foreclosure in the newspapers.  (Doc. 32-1, p8; Doc. 32-10, p.7)

43.    Home Point's actions in not providing Plaintiffs a loan modification, but instead some partial loan without explanation, then denying the loan modification for without telling them what they were considered for and for allegedly financial reasons when they had recently submitted an financial documents and then their conduct and misrepresentations leading up to the foreclosure sale cause me to

11

experience frequent anger, anxiety over the confusion and potential loss of their home, worry about my wife and the situation. (Doc. 32-1, p.8)

44.    It also caused a strain on the marital relationship with my wife due to the stress, anxiety and financial worry leading to arguments over this situation. Some have been severe enough to cause them to contemplate separation. (Doc. 32-1, p8; Doc. 32-10, p.9)

45.    During this time both plaintiffs suffered weight gain with Josh gaining approximately 20 pounds and Lee approximately 30 pounds. (Doc. 32-1, p.8; Doc. 32-10, p.8)

46.    Josh also suffered loss of sleep starting around the time we were sent the confusing promissory note and mortgage. It lasted through the time my attorneys filed the lawsuit to keep us from being foreclosed and has continued past that date, but it has lessened since the foreclosure sale date.  My loss of sleep was due to waking up in the middle of night. My mind would be racing, worrying about this situation, not knowing what was going on and not knowing if we would lose our house based on Home Point's actions and communications with us. Sometimes I would be awake for an hour or two, but if I woke up after about 3 am I typically wouldn't go back to sleep. (Doc. 32-1, p.9)

47.    Josh's mental anguish also manifested itself in a fear of answering the door, getting the mail and answering the phone worried that there would be some

threatening or embarrassing letter, door hanger or call that we would have to deal with or that the kids would see left on the door or in the mail. (Doc. 32-1, p.9)

48.     This was also extremely embarrassing with our neighbors and friends who saw the newspaper listing and became aware that our home was in foreclosure. This caused me to frequently wonder how many people we know that may have seen the newspaper or had become aware that we were in foreclosure. This has affected our relationships with friends and family due to the public display of a foreclosure advertisement that never should have happened. (Doc. 32-9, p.8; Doc. 32-10, p.8-9)

49.     This was also extremely frustrating due to the constant worrying about whether there was a solution at all to our situation. (Doc. 32-1, p.9; Doc. 32-10, p.9)

50.     Last year I was also put on medication due to high blood pressure that I believe was caused, at least in part, by the amount of stress and anxiety this has caused.(Doc. 32-1, p.10)

51.     This also caused constant worry during this time about our financial affairs, being foreclosed on, being confused and unsure about what was going on and from the communications that we received from Home Point and through its lawyers that were threatening and sometimes confusing. These things also caused frequent states of sadness over the whole situation. (Doc. 32-1, p.10)

52.    Home Point and its lawyer's actions have caused Lee Otwell embarrassment with the posting of door hangers and publicly advertising a foreclosure in the news papers. (Doc. 32-10, p.7)

53.    Home Point's actions in not providing us a loan modification, but instead some partial loan without explanation, then denying the loan modification without telling plaintiffs what they were considered for and for allegedly financial reasons when they had recently submitted an financial documents and then their conduct and misrepresentations leading up to the foreclosure sale cause Lee Otwell to experience anger, persistent anxiety and worry over the confusion and potential loss of her home. This also caused a change in her self image causing me to be constantly on edge, less confident and consistently sad and unhappy. (Doc. 32-10, p.7-8)

54.    Lee Otwell also suffered physical manifestations of her mental anguish including, difficulty concentrating on things at home and work due to this rolling around in my mind most hours of the day; bouts of crying about our situation from the fear and stress and confusion from Home Point's actions and confusing and threatening communications; suffering from frequent stress/tension headaches most every day, especially from the time they were sent the confusing promissory note and through the scheduled foreclosure in June 2019; and weight gain of approximately 30 pounds. (Doc. 32-10, p.8, 10)

55.    This has caused fear and a sense of embarrassment in answering the door, when the phone rings or when we pull up to the house, as Lee Otwell was worried and embarrassed that some of her neighbors knew and were also worried about her children reading notices left on the door. (Doc. 32-10, p.8-9)

56.    This has caused embarrassment with our friends, Jennifer and Robbie Batting who saw the newspaper listing and became aware about the foreclosure.  This causes stress, worry and embarrassment over what their friends and neighbors know about our situation. She felt humiliated and mortified by the thought of people knowing what they were going through and what they thought of us. This embarrassment has caused them to stop gathering with neighbors or friends that we are too embarrassed to be around due to this situation. (Doc. 32-10, p.9)

57.    Lee Otwell also suffered loss of sleep starting around the time we were sent the confusing promissory note and mortgage. It lasted through the present, but it has lessened since the foreclosure sale date.  During the worst periods and most stressful times, she was consistently getting only 3 hours of sleep a night. She would lay awake not being able to go to sleep with my mind racing and not being able to stop worrying about this situation, not knowing what was going on and not knowing if they would lose their house based on Home Point's actions and communications with us. She has been prescribed multiple prescriptions for sleep, but they do not seem to help very much. (Doc. 32-10, p.9)

58.     This was also extremely frustrating due to the constant worrying about whether there was a solution at all to our situation, feeling trapped and like we had no way out. (Doc. 32-10, p.9)

59.     Sometime in 2019 Lee was also put on medication due to high blood pressure that she believed was caused, at least in part, by the amount of stress and anxiety this has caused. (Doc. 32-10, p.10)

60.     This also caused her to feel a sense of hopelessness and being overwhelmed not knowing what to do or how they would get out of this with constant worry during this time about our financial affairs, being foreclosed on, being confused and unsure about what was going on and from the communications that they received from Home Point and through its lawyers that were threatening and sometimes confusing. These things also caused frequent states of sadness over the whole situation. (Doc. 32-10, p.10)

61.     During their efforts to obtain a modification and through the present Lee Otwell am frequently irritable, feeling like I am always on high alert. I feel "snippy" and frequently have a short fuse with my husband, sometimes children and those around me. (Doc. 32-10, p.10-11)

## Legal Argument

### Introduction

16

Defendant uses a common tactic to attempt to gain summary judgment. Rewriting the Plaintiffs' Amended Complaint in such a way that Defendant's arguments prevail. But Defendant is not allowed to rewrite the Amended Complaint -- the Plaintiffs are still masters of their complaint.

While Defendant confidently asserts on page 5 of Doc. 28 that "The gravamen of the Otwells' retooled complaint is the averment that Home Point failed to offer them a permanent loan modification" this is simply incorrect.

The Amended Complaint is very clear what it is claiming. The failure of Home Point to properly consider the loss mitigation is a part (small part) of the lawsuit, and there are many other aspects.

Home Point made a calculated gamble in its summary judgment brief that it could rewrite the Amended Complaint and win. It chose to make very specific arguments that in hindsight are not wise. This is a problem Home Point will have to live with as it has limited the bounds of the discussion in the summary judgment well shy of the reach of the Amended Complaint. The arguments it passed on making will have to be asserted, if at all, at trial and of course not in its reply brief. It is apparent that a moving party cannot fail to make arguments and then make them for the first time in a reply brief. This sort of gamesmanship is not tolerated and the undersigned do not believe Home Point would attempt to do this -- if wrong, then the Ottwells will file a motion to strike any new arguments.

## A.   Count I - Violations of RESPA

The Eleventh Circuit recently noted that when analyzing a plaintiff's RESPA claims, "[g]uiding this analysis is the principle that RESPA, as a remedial consumer-protection statute, should be construed liberally in order to best serve Congress's intent." *Renfroe v. Nationstar Mortg., LLC*, 822 F. 3d 1241, 1244 (11th Cir. 2016).

Here is the simple claim.  A full loss mitigation package was filled out.  And Home Point (perhaps -- it is unclear) sent or had sent a new note and mortgage made payable to the government, not Home Point.  At the time this was sent in December, no notice was given to Otwells about what was happening or that other options were rejected.

And then when Home Point -- by its previous counsel -- would not respond to the Otwells' request for clarification on what this unusual note and mortgage were for, then Home Point claimed the Otwells rejected the loss mitigation.  But a mortgage company cannot send confusing documents and then refuse to explain[1] and use that to blame the homeowner.

The brief of Home Point makes it clear on pages 7-8 that the failure of the Otwells to sign the agreement is the basis for not modifying the loan.  But what Home Point actually told the Otwells (even though the Otwells were represented) in

---

[1] Counsel for Otwells could not reach out directly to Home Point as Home Point was represented.  As set forth in Otwell Undisputed Facts 17-20, multiple attempts were made to reach Home Point's prior counsel and by March the prior counsel said to get with Home Point.  By then, the default letter had been sent, the loss mitigation closed, and the foreclosure was being set.

the February 19, 2019, letter sent directly to the Otwells was that the Otwells were not eligible because of a review of their "financial and other information."

Well, which reason is true?

Was the mysterious new loan and mortgage that Home Point would not explain a legitimate loss mitigation option that the Otwells foolishly turned down? Or is the truth that Home Point only considered the Otwells for this one type of help and then refused to explain it.

RESPA does <u>not</u> require a mortgage company to give a particular type of loss mitigation but it does require a fair evaluation of and communication of the results. And all loss mitigation options must be considered. *See Bennett v. Bank of Am.*, 126 F. Supp. 3d 871, 884 (E.D. Ky. 2015) (section 1024.41 imposes a duty on a servicer to notify a borrower of all loss mitigation offers). Here is what *Bennett* says:

> Rushmore further argues that it met the requirements of section 1024.41 by sending the Bennetts the forbearance agreement. R. 30 at 9–10. Rushmore asserts that it did not have a duty to extend any other offers to the Bennetts. *Id.* at 9. Rushmore is correct that section 1024.41 does not "impose[ ] a duty on a servicer to provide any borrower with any specific loss mitigation option." 12 C.F.R. § 1024.41(a). **But section 1024.41 does require a servicer to notify the borrower of the servicer's "determination of which loss mitigation options, if any, it will offer to the borrower." 12 C.F.R. § 1024.41(c)(1)(ii). So section 1024.41 does impose a duty on a servicer to notify a borrower of all loss mitigation offers.** The Bennetts allege that Rushmore decided to offer the Bennetts two different loss mitigation options: the forbearance agreement and a proprietary trial loan modification. R. 28 ¶¶ 87–89; *see also* R. 28–1; R. 28–2 ("Our records indicate Rushmore reviewed and approved the loan for a proprietary trial loan modification...."). As such, section 1024.41(c)(1)(ii) required Rushmore notify the Bennetts of both

offers. 12 C.F.R. § 1024.41(c)(1)(ii). But the Bennetts claim they never received notice of the offer for a proprietary trial loan modification. R. 28 ¶ 90. So the Bennetts pled sufficient facts to state a claim that Rushmore violated section 1024.41.

*Bennett v. Bank of Am., N.A.*, 126 F. Supp. 3d 871, 884 (E.D. Ky. 2015)(emphasis added).  *See also Official Interpretations of Reg. X § 1024.41(c)(1)-2*:

> (i) Evaluate the borrower for **all loss mitigation options available to the borrower**; and

> (ii) Provide the borrower with a **notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage**. The servicer shall include in this notice the **amount of time the borrower has to accept or reject** an offer of a loss mitigation program as provided for in paragraph (e) of this section, if applicable, and a notification, if applicable, that the **borrower has the right to appeal the denial of any loan modification option** as well as the amount of time the borrower has to file such an appeal and any requirements for making an appeal, as provided for in paragraph (h) of this section.

[Emphasis added].

These simple requirements of RESPA did not happen and a jury needs to consider whether Home Point has violated RESPA.

**The Otwells suffered damages as a result of Defendants' RESPA violations.**

In a recently decided opinion by the Eleventh Circuit, the court held "construing RESPA's unqualified language of 'actual damages' broadly, and based on the interpretations of 'actual damages' and other consumer-protection statutes that are remedial in nature, we see no reason why plaintiff cannot recover non pecuniary damages, such as emotional distress, under RESPA." *Ranger v. Wells*

*Fargo Bank N.A.*, Appellate Case No. 17 – 11131 at *10 (11th Cir. December 11, 2018) *citing In Catalan v. GMAC Mortg. Corp.,* 629 F.3d 676, 696 (7th Cir. 2011)(noting that emotional-distress damages are recoverable under RESPA).

Additionally, the court held that the plaintiff's complaint "plausibly links Plaintiffs' allegation that they suffered emotional distress to Wells Fargo's violations of RESPA[]" noting, "[m]oreover, the thrust of plaintiff's allegations is that all their emotional distress could've been avoided had Wells Fargo heeded the request to correct the alleged error that they had failed to pay their mortgage." *Ranger, at *11.*

Damages such as "mental anguish and emotional distress resulting from [servicer's] decision ... to continue its wrongful attempts to collect money not owed;" and "damage to Plaintiff's credit and reputation" have been recognized as supporting cognizable RESPA claims. *Diehl v. Money Source, Inc.,* 2018 U.S. Dist. Lexis 99567, 2018 WL 2995721 at *22-23 (S.D. Ala. June 13, 2018). *See, also Renfroe*, 822 F.3d at 1246-47 (concluding that "[w]hen a plaintiff plausibly alleges that a servicer violated its statutory obligations and as a result the plaintiff did not receive a refund of erroneous charges, she has been cognizably harmed" for purposes of RESPA's "actual damages" requirement); *Baez v. Specialized Loan Servicing, LLC*, 709 Fed.Appx. 979, 983 n.2 (11th Cir. Sept. 22, 2017) (recognizing that "a plaintiff could establish actual damages [under RESPA] where a servicer fails to respond to a notice of error by fixing past errors and issuing refunds of erroneous

charges")(emphasis added); *Hernandez v. J.P. Morgan Chase Bank N.A.*, 2016 U.S. Dist. LEXIS 95966, 2016 WL 3982496, *9-10 (S.D. Fla. July 22, 2016) (finding genuine issue of material fact as to RESPA damages where "[i]f a jury were to find that Chase's investigation was insufficient and that there was in fact an error with Plaintiff's account, then Chase would have been obligated under RESPA to refund to Plaintiff the various fees and charges that his account was charged," but "Chase did not do that").

The Otwells testified that Ocwen's failure to provide a modification or even properly notify them of the decision caused mental anguish.  This is enough to go to the jury.

### C. Count II - Violations of the Fair Debt Collections Practices Act (FDCPA)

Defendant's only attacks on Plaintiff's FDCPA claims are simply that Plaintiffs cannot prove FDCPA violations under the assumption that all of Plaintiff's claims are based solely on Home Point's "alleged failure to give a loan modification as a statutory infraction." [Doc. 28 p. 10, Brief in Support of Defendant's Motion for Summary Judgment].  Home Point spends a meager two paragraphs attacking the FDCPA claims.

Home Point's efforts to replead Otwells' Amended Complaint are misplaced, as Otwells are the master of their own complaint. Their FDCPA claims allege conduct constituting misrepresentations, that were false and untrue, threats to take

22

legal action, such as to foreclose, which Home Point could not legally take and actions that were abusive, threats to take property when it was illegal to do so, communicating with Otwells even when Home Point knew Otwells were represented, and other such conduct summarized below.

While the below discussion is not needed as Home Point <u>did not even attempt to disprove any of these claims</u>, the following is presented to show that even had Home Point attacked these claims[2], they would all survive.

Some of the FDCPA claims are based on the wrongful conduct which arises out of the failure to send the correct notices as required under Alabama law.  In Alabama, it is undisputed that in order to conduct a nonjudicial foreclosure, the mortgage requirements of sending a proper default letter must be sent or the foreclosure is void.  As explained by the Alabama Supreme Court:

> The Turners have demonstrated that the above-quoted portion of the Court of Civil Appeals' decision is in conflict with *Jackson*. Wells Fargo failed to provide the Turners with proper notice under the mortgage. Accordingly, because Wells Fargo failed to comply with the requirements of the mortgage, the **mortgage sale conducted on February 27, 2012, failed**. *See Jackson [v. Wells Fargo Bank, NA]*, 90 So. 3d at 173 [Ala. 2012](holding that a foreclosure sale **failed to pass title to the purchaser because the mortgagee failed to strictly comply with the terms of the mortgage in giving notice**[3] **to the defaulting mortgagor**).

---

[2] Of course Home Point cannot in its reply brief suddenly start arguing the FDCPA claims are due to go out as its sole argument is restricted (by its own strategy) to simply saying the FDCPA is based solely not getting a loan modification which is simply incorrect.

[3] In *Jackson*, the defect was the default letter was combined with the acceleration letter when Paragraph 22 requires that these be two separate letters spaced apart at least 30 days.  Default letter comes first and only if not cured can the acceleration letter be sent.  "The 'Fannie Mae/Freddie

*Turner v. Wells Fargo Bank, N.A.*, 254 So. 3d 207, 213 (Ala. 2017)(emphasis added).

Sending a proper and accurate default letter is a condition precedent to accelerating the loan which is a condition precedent to advertising an upcoming foreclosure sale which is a condition precedent of actually conducting the foreclosure sale.

So if the proper default letters were not sent -- and this is a fact question -- then Home Point was not authorized under the law or the mortgage to accelerate the loan.

If the loan was not accelerated, then Home Point was not allowed under the mortgage or the law to advertise a foreclosure sale.

Home Point could not, under the FDCPA, threaten to foreclose.

Now let's look at how the FDCPA relates to the failure of Home Point to properly send a default letter and accelerate the loan.

---

Mac Uniform Instrument' mortgage form in this case contained the species of provisions referenced in the excerpt from Real Estate Finance Law quoted above. Specifically, paragraph 22 of the form required the bank to give the Jacksons a notice -- before acceleration -- that it was considering an acceleration, upon the failure of certain conditions, in 'not less than 30 days' following the date of the notice. In other words, the debt could not be accelerated until at least 30 days had passed and the Jacksons were still in default. Under the language of this mortgage, **without proper notice of intent to accelerate, acceleration fails and, consequently, so does the foreclosure sale**." *Jackson v. Wells Fargo Bank, Nat'l Ass'n*, 90 So. 3d 168, 172 (Ala. 2012)(emphasis added).

A default letter, defective as it was, dated February 21, 2019, was sent to the Otwells.  But this letter did NOT accelerate the loan.

Only **after** an acceleration of the loan can a foreclosure be scheduled and advertised.  [Mortgage at paragraph 9 and 18].  No such acceleration happened.

One reason there was no acceleration is that the default letter of February 21, 2019, was defective.  Here is a listing of the defects:

- The date of the oldest payment in default is listed as June 2016 but a Home Point letter dated two days earlier on February 19 listed April 2016.  [First sentence of second paragraph in both letters].

- The amount to cure is different than the letter of February 19. [Second paragraphs in both letters].

- There is no indication of an acceleration -- instead merely the possibility of one as the letter says "may result in the acceleration" of the loan.  [First sentence of third paragraph].

- The letter falsely claims that "You have the right to assert in any foreclosure proceeding, the non-existence of a default or any other defense you have to the acceleration and sale of the property." [Second sentence of last paragraph on page 1 of February 21 letter]. This is the same error that *Turner* flagged and reversed a foreclosure over.

- Finally, the letter does not begin to comply with the Single Family Housing Policy Handbook that contains the requirements for FHA loans such as enclosing a pamphlet "Save your Home -- Tips to Avoid Foreclosure;" not listing the number of late payments, the month of each late payment[4]; original due date of each late payment; no evidence of a face to face meeting; and not showing a "request for current Borrower financial information necessary for Loss

---

[4] The February 21 letter lists $110.77 in late charges but no explanation for which months those late charges are attributable to.

Mitigation analysis."  FHA Single Family Housing -- 4000.1 -- Servicing and Loss -- Title II Insured -- Default Servicing -- Early Default Intervention -- "x. Required Notices to Borrower by 60th Day of Delinquency."  No evidence exists this was ever sent whether at the 60 day delinquency mark or any other day.  This document can be accessed at https://www.hud.gov/program_offices/housing/sfh/handbook_4000-1 which when clicked on leads to https://www.allregs.com/tpl/?r=4a846d57-d739-4a20-8097-be956c9fb470.

Lest there be any doubt about the validity of seeking guidance from the Single Family Housing Policy Book, the Massachusetts Appellate Court[5] wrote this:

a. *The judge's failure to consider the HUD Handbook.* The Cooks first contend that the **judge erred in refusing to consider the HUD Handbook as interpretive guidance when construing 24 C.F.R. § 203.604(b)**. We **agree**. Although the HUD Handbook is not binding on the court, **it is relevant interpretive guidance that should be used when construing the HUD regulations**. See *Global NAPs, Inc. v. Awiszus,* 457 Mass. 489, 496–497, 930 N.E.2d 1262 (2010) ("[T]he [Massachusetts Commission Against Discrimination] Guidelines ... are entitled to substantial deference, [but] they do not carry the force of law"). **Indeed, Federal and State courts have routinely considered HUD handbooks when interpreting HUD regulations**. See, e.g., *Burroughs v. Hills,* 741 F.2d 1525, 1529 (7th Cir.1984) (HUD handbook not binding on court "but is entitled to notice so far as it is an official interpretation of statutes or regulations with which it is not in conflict" [citation omitted] ); *Kolbe v. BAC Home Loans Servicing, LP,* 738 F.3d 432, 449–451 & n. 18 (1st Cir.2013) ; *Wells Fargo Bank, N.A. v. Goebel,* 2015-Ohio-38, at ¶ 30, 2015 WL 132619 (Ct.App.2015) ; *Squire v. Virginia Hous. Dev. Authy.,* 287 Va. 507, 516–517, 758 S.E.2d 55 (2014). Because the HUD Handbook does not conflict with the plain language of the HUD regulations, **we conclude that the judge**

---

[5] Alabama has looked to Massachusetts related to foreclosures in the *Ex parte Turner* case at footnote 1 noting the strict compliance rule. *Turner v. Wells Fargo Bank, N.A. (Ex parte Turner)*, 254 So. 3d 207, 212 n.1 (Ala. 2017).

**erred in declining to consider it as persuasive interpretive guidance when construing the face-to-face interview requirement set forth in 24 C.F.R. § 203.604(b)**.

*Wells Fargo Bank, N.A. v. Cook*, 31 N.E.3d 1125, 1129-30 (Mass. App. Ct. 2015)(emphasis added).

24 CFR Section 203.602 states:

**§ 203.602 Delinquency notice to mortgagor.**
The mortgagee **shall give notice to each mortgagor in default on a form supplied by the Secretary** or, if the mortgagee wishes to use its own form, on a form approved by the Secretary, no later than the end of the second month of any delinquency in payments under the mortgage. If an account is reinstated and again becomes delinquent, the **delinquency notice shall be sent to the mortgagor again**, except that the mortgagee is not required to send a second delinquency notice to the same mortgagor more often than once each six months. The mortgagee may issue additional or more frequent notices of delinquency at its option.

This is why the Single Family handbook has to be followed and the reason the CFR has to be examined is the Mortgage at Paragraph 9 limits acceleration to only when the HUD rules are followed.

Home Point is not allowed to threaten to do something it has no intention of doing or no legal basis to do.  15 USC Section 1692e(4); 1692e(5); and 1692f(6). The subsections are merely examples of what violates 1692e and 1692f.  Since Home Point could not accelerate, and indeed did not accelerate, then no foreclosure could be scheduled or advertised.

The letter also violated 1692e, 1692e(2) as the amount of the debt was misstated; and 1692e(10) as the debt was misrepresented.

27

Home Point also on multiple occasions communicated directly with a represented consumer violating 1692c(a)(2).

Home Point has harassed and oppressed Otwells by scheduling and advertising a foreclosure when there was no legal right to do so -- this naturally harms a consumer, violating Section 1692d.

The other 1692e violations come from the misrepresentations in the April 15 validation letter and in the response to Otwells' request for verification (June 7, 2019).  And from not marketing Otwell's credit reports as disputed as required by Section 1692e(8).  Finally on 1692e, the April 15 and June 7 letters seek to minimize the warning of Section 1692e(11) by suggesting that the FDCPA does not even apply.

Lest Home Point try to escape liability by saying it is only the fault of its collection law firm Rubin Lublin, long standing case law in Alabama forecloses this argument:

> Next, FFC [a debt collector] argues that it cannot be held liable under the Act for the misconduct alleged by Kimber, because all actions complained of were **perpetrated by the corporation's attorney**, rather than the corporation itself. The court disagrees.

> The corporation rightly notes that the statute expressly exempts from its reach "any attorney-at-law collecting a debt as an attorney on behalf of and in the name of a client." 15 U.S.C.A. § 1692a(6)(F). This provision, however merely creates an immunity for the attorney, not for the client on whose behalf the collection is undertaken. To interpret § 1692a(6)(F) otherwise would severely undermine the Act and frustrate the intent of Congress, for a debt collector could simply evade the Act

28

> by hiring an attorney to do what it could not do itself. **This understanding of § 1692a(6)(F) is also consistent with Alabama's general rule that "omissions and commissions of an attorney at law are to be regarded as acts of the client whom he represents."** *Lawrence v. Gayle,* 294 Ala. 91, 312 So.2d 385, 387 (1975); *see also Massey v. Educators Investment Corp. of Alabama, Inc.,* 420 So.2d 77 (Ala. 1982).

*Kimber v. Federal Financial Corp.*, 668 F. Supp. 1480, 1486 (M.D. Ala. 1987)(emphasis added).

Section 1692f (including 1692f(6)) has been violated by threatening a foreclosure when such was illegal (due to an improper default letter and no acceleration).

Finally Section 1692g has been violated as Home Point's April 15 letter through its collection counsel Rubin Lublin overshadowed the purpose of 1692g disclosures and failed to properly respond to Otwells' request for verification.

The purpose of a consumer being able to dispute under Section 1692g is to provide a non court remedy to challenge a debt collector's right to collect. When it is ignored or brushed aside as happened here, there is only one choice: file a lawsuit. Home Point through its deeds indicated that it would only stop the foreclosure if Otwells sued. Otwells accommodated Home Point.

Thus, issues of fact exist precluding summary judgment as to Otwells' FDCPA claims and a jury needs to decide whether Home Point violated the law or not.

One brief word on damages -- emotional distress damages are commonly allowed in FDCPA suits and the affidavits of the Otwells clearly show the damages the actions of Home Point and its collection law firm caused the Otwells.  As the Eleventh Circuit has long held:

> The FDCPA also allows a plaintiff to recover "any actual damage sustained" as a result of a violation of the statute. 15 U.S.C. § 1692k(a)(1). **Actual damages under the FDCPA include damages for emotional distress**. *Johnson v. Eaton,* 80 F.3d 148, 152 (5th Cir. 1996) (noting that the FDCPA not only requires that the debt collector compensate the debtor for any monetary damages, **but also for "emotional distress or other injury that the debtors can prove the debt collector caused."**). Because we conclude that Minnifield **sufficiently alleged a violation of § 1692f to survive Johnson & Freedman's Rule 12(b)(6) motion, we also vacate and remand the district court's dismissal of her emotional distress claim under FDCPA**.

*Minnifield v. Johnson & Freedman, LLC*, 448 F. App'x 914, 4-5 (11th Cir. 2011)(emphasis added).

This is a matter for a jury to decide the existence of and amount of damages to award Otwells.

### C.  Count III – Negligent or Wanton Supervision

Plaintiffs withdraw the claims in Count III.

### D.  Count IV – Negligent and/or Wanton Conduct

Plaintiffs withdraw the claims in Count IV..

### E.  Count V - Invasion of Privacy

There is no dispute that companies like Defendant Home Point have the right to take "reasonable action" in collecting a debt, including foreclosure.  [Doc at 25 *citing Norris v Moshkin Stores, Inc.*, 132 So.2d 321, 323 (Ala. 1961)].  But when there is no right to foreclose, how could this be described as "reasonable" -- it cannot be.  It is patently <u>unreasonable</u> to threaten and advertise that Home Point (or some high bidder) will take ownership of Otwells' home when Defendant had no right to do so.  The only thing that stopped Home Point is this lawsuit.  "[T]he filing of this case succeeded in its one, true purpose.  Home Point's foreclosure sale was cancelled and has not yet been rescheduled."  Doc. 28 at 5.

As Judge Kallon found in a motion to dismiss context:

To withstand a motion to dismiss, a plaintiff may allege a "physical intrusion into a place in which the plaintiff has secluded himself," "an invasion of psychological solitude," or "examination into [the plaintiff's] private concerns" - **so long as the plaintiff also asserts that the invasion would be offensive to a reasonable person**. *Phillips,* 435 So. 2d at 710-11, quoting Restatement § 652B cmt. a. The Restatement further provides that **"hounding the plaintiff" to collect a valid debt can be a sufficiently offensive intrusion to satisfy the elements for this form of invasion of privacy**. Restatement § 652B cmt. d.
To support their invasion of privacy claim, Plaintiffs assert that Defendants "have **threatened multiple times to foreclose on Plaintiffs when Defendants have no right to do so**" and cite multiple examples of Defendants' collection attempts that purportedly caused "mental anguish, damage to reputation, [and] economic damages[.]" Doc. 10 at 11 ¶ 72; 14 ¶ 90. Based on these allegations, and the reasonable inferences the court can draw from them, the complaint states a facially plausible claim for relief. *See Iqbal,* 129 S. Ct. at 1949. Therefore, the **motion to dismiss this claim is denied**.

*Hope v. BSI Fin., Inc.*, Civil Action No. 5:12-cv-00736-AKK, at *12-13 (N.D. Ala. Oct. 26, 2012)(emphasis added).  In the same way, the evidence supports that the attempted foreclosure (with advertisment in a public newspaper seen by friend) when there was no legal right to do so crosses a line.  Home Point can certainly collect, but when it chose to publicly almost foreclose without the right, then it invaded the privacy of the Otwells.

### F.  Count VI – Fraud or Fraudulent Suppression

Plaintiffs withdraw the claims in Count VI.


## CONCLUSION

Otwells respectfully request this Honorable Court to DENY the motion for summary judgment on the RESPA, FDCPA and Invasion of Privacy Counts (One, Two, and Five) and set a pre-trial at this Honorable Court's convenience.

Respectfully Submitted,

 /s/ M. Stan Herring
**John G. Watts (ASB-5819-t82j)**
**M. Stan Herring (ASB-1074-n72m)**
**Watts & Herring, LLC**
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 879-2447
(888) 522-7167 *facsimile*
john@wattsherring.com
stan@wattsherring.com
**Attorneys for Plaintiffs**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 12, 202, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send notification

of such filing to the following:


Timothy P. Pittman
Rubin Lublin, LLC
200 Clinton Avenue West, Suite 406
Huntsville, Alabama 35801


/s/ M. Stan Herring
OF COUNSEL
