

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **JOSHUA OTWELL, an individual,** | ) | |
| **DANNA LEE OTWELL, an** | ) | |
| **individual,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No.:** |
| | ) | |
| **v.** | ) | **4:19-cv-01120-ACA** |
| | ) | |
| **HOME POINT FINANCIAL** | ) | |
| **CORP., a Corporation;** | ) | <u>**Oral Argument Requested**</u> |
| | ) | |
| **Defendant.** | ) | |

## <u>PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE [DOC. 51 ] TO PLAINTIFF'S MOTION TO RECONSIDER OR TO ALTER OR AMEND [DOC. 48] ITS ORDER AND PARTIAL SUMMARY JUDGMENT [DOC. 41] AND MEMORANDUM OPINION [DOC. 40]</u>

Respectfully Submitted,

<u>*/s/M. Stan Herring*</u>
**John G. Watts (ASB-5819-t82j)**
**M. Stan Herring (ASB-1074-n72m)**
**Watts & Herring, LLC**
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 879-2447
(888) 522-7167 *facsimile*
john@wattsherring.com
stan@wattsherring.com
**Attorneys for Plaintiffs**

I.   *Lodge* **Was In Fact a Change in the Standard Applied to Mental Anguish Damages.**

While Defendant claims *Lodge* does not make any change to the evidentiary standard for mental anguish damages, the *Lodge* Court recognized that it conflicted with precedent so it carved out the bankruptcy automatic stay.    Expressly acknowledging the change, *Lodge* stated:

> We conclude that *Marable v. Walker,*704 F.2d 1219, 1220–21 (11th Cir.1983) (holding that damages for emotional distress "in cases of this type 'may be inferred from the circumstances as well as proved by the testimony' "), **does not apply here**, as it concerns damages for emotional distress in cases under the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982, and the Fair Housing Act, 42 U.S.C. § 3601, *et seq.,* **not damages for emotional distress for violations of an automatic stay during the course of bankruptcy proceedings**. *See Sheely v. MRI Radiology Network, P.A.,*505 F.3d 1173, 1180, 1199 (11th Cir.2007) (providing that emotional distress is a predictable and foreseeable consequence of discrimination and that federal courts **have long found that violations of antidiscrimination statutes frequently result in emotional distress to victims**).

*Lodge v. Kondaur Capital Corp.*, 750 F.3d 1263, 1273 n.12 (11th Cir. 2014)(Emphasis added).   These cases are discussed in the Motion to Reconsider (Doc. 48 at pags 17 and 21 for *Marable* in context of other decisions and pages 22-23 for *Sheely*).   The discussion in the motion to reconsider at pages 17-27 addresses the Eleventh Circuit cases that differ from *Lodge* starting in 1990 and going through 2019. The *Lodge* standard is discussed in Plaintiffs' Motion to Reconsider at pages 5-6.

2

## II.  The Standard to Be Applied to Evaluate Mental Anguish Damages

### A. The 4th Circuit Case of *Robinson v. Equifax* is Not Binding, Regardless, the Otwells met the *Robinson* standard

Defendant cites *Robinson v. Equifax*, 560 F.3d (4th Cir. 2009), and suggests the Otwells improperly ignored this FCRA decision which discusses emotional distress (Doc. 51 at 3-5).  First, to the undersigned's knowledge, *Robinson* has not been cited in any reported decision in the Eleventh Circuit except in Your Honor's opinion of February 9, 2021.

*Robinson* examined a six figure award, a portion of which was for emotional distress damages. *Robinson* affirmed the award based upon the testimony at trial. The court described the testimony as follows:

> In this case, Robinson **presented evidence that her mental distress manifested itself as headaches, sleeplessness, skin acne, upset stomach, and hair loss**. Moreover, the *testimony of Robinson's friends and family members painted a detailed picture of her ongoing struggles with Equifax and the emotional toll these events took upon her. Illustratively, one of Robinson's co-workers testified that in response to her continued problems with Equifax, Robinson "would be crying" and "screaming" and often she was "upset . . . [and] stressed."* (J.A. 799.) Another co-worker recounted that *Robinson only complained about Equifax and that she was often "visibly upset" as a result of the company's conduct.* (J.A. 732.) As her mother recalled, *Robinson was "[d]istraught" and there "were changes in her physical appearance. There were changes in her demeanor, her interactions with her daughter and her family, [and] friends."* (J.A. 1022-23.)

*Robinson v. Equifax Information*, 560 F.3d 235, 241 (4th Cir. 2009)(Emphasis added).  Certainly in Robinson there were other witnesses, but were those

3

statements *conclusory*?   Were they required or could the plaintiff prove the case

with the plaintiff's own testimony?

Let's look at the "standard" in *Robinson*.   Defendant says on page 4 of its

brief, "This is effectively the same standard applied in *Lodge*."   Here is the

"*Robinson* standard":

> "Our previous cases establish the type of evidence required to support
> an award for emotional damages." *Sloane*, 510 F.3d at 503. As we
> recently explained:
>
> We have warned that not only is emotional distress fraught with
> vagueness and speculation, it is easily susceptible to fictitious and
> trivial claims. For this reason, although specifically recognizing that a
> **plaintiff's testimony can provide sufficient evidence to support an
> emotional distress award**, we have required a <u>plaintiff to reasonably
> and sufficiently explain the circumstances of the injury and not resort
> to mere conclusory statements</u>. Thus, we have distinguished between
> plaintiff testimony that amounts only to conclusory statements and
> plaintiff testimony that sufficiently articulates true demonstrable
> emotional distress.

*Robinson v. Equifax Information*, 560 F.3d 235, 241 (4th Cir. 2009)(Emphasis

added).   Note the above is the standard that the 4th Circuit applies and it says "[A]

plaintiff's testimony can provide sufficient evidence to support an emotional

distress award..."   The standard is a plaintiff should not merely rely only

conclusions but must explain the damages.

We don't need the Fourth Circuit for this understanding, as there is a body of

case law in the Eleventh Circuit that explains that the standard of a plaintiff's own

testimony to support emotional distress damages, outside of bankruptcy stay violations, is sufficient. *See* Motion (Doc.48 at 17-26).

But a quick look at two recent district court opinions citing *Robinson* or its predecessor opinion of *Sloan* are instructive as they are from the Fourth Circuit:

> ...Wood's evidence of emotional damages by itself could allow Wood to survive summary judgment. **The signed, sworn statements in Wood's declaration and his deposition testimony describe "true demonstrable emotional distress," and are <u>not simply conclusory statements</u>**. *See, e.g., Sloane* , 510 F.3d at 502 (affirming the district court's ruling that the jury's emotional distress award was "not an unreasonable conclusion from [the] evidence" because the jury could have found that the defendant's actions "directly led to the mounting frustration and distress that [plaintiff] felt for almost two years"). **Wood's statements under oath detail damaged relationships, lost sleep, and feelings of shame, anger, fear, hopelessness, and frustration**. In light of the clearly settled law in the Fourth Circuit on this issue, the Court must deny Credit One's Motion for Summary Judgment on the issue of damages.

*Wood v. Credit One Bank*, 277 F. Supp. 3d 821, 845-46 (E.D. Va. 2017).  The plaintiff Wood's affidavit, which is the only evidence cited by Plaintiff opposing summary judgment on emotional distress damages, is attached as Exhibit "A" to this filing.  It does not contain nearly the detail of the Otwell affidavits. Nevertheless, the court found it was sufficient even under the Fourth Circuit's standard for emotional distress in an FCRA context.  This testimony was not deemed "conclusory" but instead was sufficient to survive summary judgment.

Additionally, the 2020 decision from the District of Maryland (in the Fourth Circuit) addressing emotional distress claims under the FDCPA held that

**While Plaintiff's evidence here only marginally exceeds that threshold, it is sufficient to proceed, even if the damages ultimately awarded would be minimal.** *See Thomas v. Smith, Dean & Assocs.* , No. ELH-10-CV-3441, 2011 WL 2730787, at \*4 (D. Md. July 12, 2011) ("awards for actual damages are minimal for emotional distress absent any indication that mental health treatment has been obtained or that the emotional distress has concretely affected a plaintiff's personal or professional life" (quoting *Ford v. Consigned Debts & Collections, Inc.* , No. 09-3102 (NLH)(AMD), 2010 WL 5392643, at \*5 (D.N.J. Dec. 21, 2010) ). **Notably, in** *Robinson v. Equifax Information Services, LLC* **, the Fourth Circuit affirmed an award of emotional damages to a plaintiff alleging that violations of her rights under the FCRA caused her "headaches, sleeplessness, skin acne, upset stomach, and hair loss."** 560 F.3d 235, 241 (4th Cir. 2009).

*Best v. Fed. Nat'l Mortg. Ass'n*, 450 F. Supp. 3d 606, 634-35 (D. Md. 2020)(Emphasis added).  In the same way, even if Your Honor feels the Otwells are not likely to recover significant damages (and we believe they will recover significant damages), the evidence is sufficient to survive summary judgment and then it will be up to the Otwells to present compelling evidence at trial.

### B.  *McLean v GMAC* does not change the analysis

Next Defendant cites *McLean v GMAC Mort. Corp.*, 398 App'x 467, 471 (11th Cir. 2010) for support.  This was discussed on pages 23-24 of the motion to reconsider (Doc. 48).  A *pro se* case was brought with no discussion of the alleged emotional distress damages in the opinion.  Instead the Eleventh Circuit merely said that damages must be proven and tied to the alleged violations and the pro se plaintiffs failed to do so.  *McLean v. GMAC Mortgage Corp.*, 398 F. App'x 467,

471-72 (11th Cir. 2010) ("Here, even if we assume *arguendo*, as the district court did, that GMAC committed two RESPA violations, we still find that the McLeans **offered no competent evidence demonstrating that any of their alleged injuries were caused** by the said violations. In sum, the McLeans' <u>conclusory allegations were insufficient to support a claim of emotional distress</u>.")(Emphasis added).

### C.     *Leak v Ocwen* **is on appeal**

Finally, Defendant cites Judge Haikala's recent decision in *Leak v Ocwen Loan Servicing, LLC*, 2021 WL 310011 (N.D. Ala. Jan. 29, 2021) on pages 6-7. This case is on appeal to the Eleventh Circuit and is in the mediation process as of today.   Judge Haikala[1] ruled the testimony in deposition by the plaintiffs was insufficient to establish emotional distress damages.  This has been appealed as we respectfully disagree with this ruling.

### D.     **An interesting recent Eleventh Circuit decision on the FDCPA and emotional distress damages to find standing under *Spokeo*.**

Perhaps a final word on this.   A recent Eleventh Circuit case, albeit unpublished, sheds some light on this issue.   In *Kottler v Gulf Coast Collection Bureau, Inc*., No. 20-12239 (11th Cir. Feb. 12, 2021), a plaintiff in an FDCPA claim survived summary judgment and actually won summary judgment in the

---

[1] The motion to reconsider (Doc. 48 at pages 15-17) discusses Judge Haikala's approach to emotional distress damages in detail in a separate 2019 decision of *Rodriguez v. Gen. Info. Servs.*, No. 5:16-cv-01067-MHH, at *22-25 (N.D.Ala. Feb. 19, 2019)

plaintiff's favor.  The debt collector appealed the plaintiff receiving a summary

judgment and claimed there was a <u>lack of standing as there was no concrete injury</u>.

The *Kottler* court affirmed the entry of summary judgment against the collector

stating as follows on this issue of damages focusing in on **pretty sparse testimony**

**about emotional distress**:

> **Kottler suffered a concrete injury that gave her standing to sue Gulf Coast for violating the Act.** "[S]tanding consists of three elements: the plaintiff must have suffered an injury in fact, the defendant must have caused that injury, and a favorable decision must be likely to redress it." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020). An injury in fact consists of four elements: the injury must invade a legally protected interest and be concrete, particularized, and imminent. *Id.* Kottler alleged in her complaint that she received a letter and telephone calls from Gulf Coast that falsely suggested she was liable for medical bills owed by her employer for a work-related accident. *See* Fla. Stat. § 440.13(2), (14). **Later, Kottler testified that she was "clustered and jumbled" why she was receiving collection calls, the messages "scared" her into calling back, and she feared that the company would "ruin her credit." Kottler's evidence satisfied each element for an injury in fact**. Kottler was entitled to avoid communication concerning collection of a debt she did not owe, *see* 15 U.S.C. § 1562e, she expended time addressing unwarranted collection calls, *see Trichell*, 964 F.3d at 997, and those **calls upset her**, *see id*.

*Kottler v. Gulf Coast Collection Bureau, Inc.*, No. 20-12239, at *2-3 (11th Cir. Feb.

12, 2021)(Emphasis added).  Now, if at summary judgment it was insufficiently

*conclusory* to say she was "clustered" and "jumbled" and "scared" and she "feared

that the [collector] would ruin her credit" then standing likely would not have

existed.  But the Eleventh Circuit had no issue two months ago recognizing that

this testimony was sufficient emotional distress to confer standing. Nothing was said about these statements being *conclusory or lacking corroboration*. Instead, the summary judgment was affirmed. Respectfully, this provides insight that the Eleventh Circuit is not changing the law well established by the 1990s that emotional distress is not judged under a more stringent standard outside of the bankruptcy automatic stay context discussed in *Lodge*.

## III.   There Was No "Alternative Trial Procedure" Proposed

Defendant talks about alternative trial procedures. Doc. 51 at 9-10. The Otwells are unsure what Defendant is arguing. Instead, Otwells simply and plainly pointed out the preference for live testimony to be considered on the issue of emotional distress damages and that by doing so, Your Honor can decide if sufficient testimony at trial has been submitted to go to the jury. And this greatly reduces any chance of a new trial.

This is hardly novel. Instead, in virtually every jury trial the undersigned have been in -- state and federal court -- the judge has said about some claim or some defense or some damage, words to the effect of, "We'll see how this plays out in testimony and then I'll decide if this goes to the jury. And the jury may decide this issue for us anyway if they rule against you on this claim/defense/damage."

### Conclusion

9

Respectfully, this interlocutory ruling on emotional distress damages should be vacated and the issue of emotional distress damages taken up at the close of the Plaintiffs' evidence, the close of all the evidence, and then, if necessary, at any post trial motion.

Respectfully Submitted,

/s/ M. Stan Herring
**John G. Watts (ASB-5819-t82j)**
**M. Stan Herring (ASB-1074-n72m)**
**Watts & Herring, LLC**
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 879-2447
(888) 522-7167 *facsimile*
john@wattsherring.com
stan@wattsherring.com
**Attorneys for Plaintiffs**

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 6, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Timothy P. Pittman
Rubin Lublin, LLC
200 Clinton Avenue West, Suite 406
Huntsville, Alabama 35801

/s/ M. Stan Herring
OF COUNSEL

# Exhibit A

Affidavit of Plaintiff in
*Wood v. Credit One Bank*, 277 F. Supp. 3d
821, 845-46 (E.D. Va. 2017)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

DAVID W. WOOD

v.                                                    No. 3:15-cv-594-MHL

CREDIT ONE BANK, N.A.

DECLARATION OF DAVID W. WOOD

I, David William Wood, am the age of majority and have personal knowledge of the facts

herein.   I am competent to make this Declaration and I do so under the laws of the penalty of

perjury of the United States.

1.      After learning that Credit One Bank had falsely reported that I had a defaulted

account, I contacted Credit One Bank over 25 times by telephone and in writing,

spending approximately 30 hours of my time directly disputing the account and

trying to get it fixed.  At that time, my base wage without holiday or overtime pay

was about $12.00/hour.  Even if I was only making my basic wage, I estimate my

out of pocket loss of time to be at least $360.00.

2.      I also had to search the internet for help with this problem when Credit One

wouldn't fix it.  I spent at least 60 hours searching for information about identity

theft, familial identity theft, and credit reporting.  Even at my basic wage, this

research caused me to lose about $720.00 in lost time.

3.      I had to find a lawyer to help me when all my other efforts failed. I wrote the

dispute letters to the consumer reporting agencies and had to mail them. This took

me about 2 hours of my time, causing me to lose about $24.00.   I spent

1

approximately $55.00 on postage to mail the letters, including one set that I sent certified, return receipt requested.

4. After my disputes were ignored and Credit One verified the account, I had to spend more time with the attorneys to get the case ready to file. I had to provide all the documentation I had gathered and work with the attorney to develop the complaint that was filed. I participated in discovery, and to prepare for and appeared for testimony in a 6-hour deposition. Altogether, I estimate I have spent 15 hours participating in litigation. Even at the minimum wage, this would be a loss of $ 180.00.

5. I have suffered many credit denials since disputing through the credit reporting agencies. Since July of 2014, and I applied for credit from several lenders, but was denied each time based on the information in my credit report that showed the defaulted Credit One Bank account.

6. I applied for credit/debit from and Comenity/PayPal in 2016 so that I could use my PayPal balance to make other purchases other than online. I was denied even for this debit card because of the defaulted account.

7. In October of 2014, I applied for a personal loan from Spring Leaf Financial, but was denied. I attempted to get the Spring Leaf loan, I believe was in an amount about $12,000.00 in order to put a home on a piece of land I own in New Kent County, Virginia, but was denied. I hoped that if I could put a home on the land in New Kent, I could avoid the repeated denials by landlords when I applied to rent an apartment.

8. In March 2016, I applied for an $8,000.00 construction loan from Wells Fargo, again in order to put a structure on a piece of land I own in New Kent County,

Virginia, but was denied. I hoped that if I could put a home on the land in New Kent, I could avoid the repeated denials by landlords when I applied to rent an apartment.

9. I applied for credit from Eastern Virginia Bank in October of 2014, but was denied. I applied for $8,000.00 from EVB in order to put up a home on my land in New Kent County.

10. I even put my motorcycle valued at $7,000.00 and the land valued at that time $8,000.00 up as collateral, and the lenders refused to loan me even the small amount I had applied for because of defaulted credit.

11. After getting turned down by Wells Fargo for such a modest loan, the loan officer there told me that if I continued to apply for credit, it would make my credit report even worse than it already was.

12. I tried to explain to the loan officers what had happened, but they didn't believe me. I felt stupid hearing this information from the people at the bank. I felt hopeless, that there was no way I was ever going to resolve this fraud. I felt that I would end up on the street.

13. After many turndowns, and after learning that to continue to try to get credit could hurt me even more, I withdrew from the credit market so that I didn't have to keep wasting time in applying and getting turned down, and also because it would further make my credit worthiness look even worse if I wasn't going to get approved anyway.

14. I was fearful that when new prospective creditors would view my report, they would think that I was the person who defaulted on the Credit One Bank account,

when I had not. I was so worried that people viewed me as untrustworthy and that I had really defaulted on that account when I hadn't, despite any explanation.

15. I thought that these complete strangers would think that if I was maxed out and defaulted, it would look like I was living off loans instead of being a financially responsible person.

16. I was not able to rent an apartment or trailer due to the fact that landlords would pull my credit report. As soon as a landlord saw the Credit One Bank account on my credit report, I was turned down.

17. The only place I could go was where I could rent a single room out of someone's home. I found that living arrangement was dangerous and toxic because the I felt the people that I rented from were unstable. I feared for my safety and well-being. I tried not to spend much time there.

18. I applied for at least three different leases for a place to live after July of 2014. Each time, the landlord pulled my credit and then denied my application to lease. For instance, in September of 2014, my credit report shows that Universal Investors pulled my credit report from Equifax, which resulted in my application for an apartment being turned down.

19. Since July of 2014, and before that, I moved from place to place, occasionally staying with friends, sometimes renting rooms, and even living in my car.

20. I lived in my car for approximately one month total, and at times, it was well below freezing. I spent those nights in the freezing cold car, lying awake and unable to sleep until sunrise all the while knowing that Credit One Bank had caused my credit report to look so bad that I could not live in an apartment or home.

21.     I didn't have a normal life because I was essentially homeless.  My social relationships with friends were strained because I felt that I imposed on them.  I didn't feel like socializing because I felt that I had not been able to do anything with my life. I felt embarrassed that I had no place to call home and I was under tremendous stress that caused me to stop seeking contact with my friends, further separating me from relationships that had brought me happiness. All of this because of my credit report.

22.     I used to love to be current on what was going on in pop culture, which I lost interest in and access to when I was without a place to call home from the beginning of 2014 through July of 2015.

23.     The failure of Credit One Bank to resolve the dispute also created more strain on my relationship with my mother, with whom I have not been able to repair our relationship in part based on Credit One's refusal to correct the account.  Every time that I have received a denial of credit based on the default reported by Credit One, I have felt anger toward my mother, creating more and more distance in our relationship.

24.     I have been employed this whole time. I am a certified nursing assistant. But, having income and a job doesn't necessarily mean you can fully participate in society without a good credit report.

25.     I would like to get more education to improve my economic circumstances, but I cannot qualify for a loan in an amount I need to finish school because of my credit report.  I applied for a private education loan was turned down based on my consumer report.   Being prevented from achieving higher education has prolonged my progression from my current wages to a higher wage.  It has also

made me feel ashamed and hopeless for my future ability to earn money, have a place to live, and to have security.

26. One of the biggest impacts that the false account has had on me is that it has made me insecure – whether it is in the ability to obtain financing for a car, to have a place to live, to get more education, my credit report that is saddled with a false account prevents me from bettering myself. I believe that I have lost and delayed economic opportunities, making me feel hopeless and afraid.

27. By not having a place to live, I haven't had the ability to pursue my passion, which is video editing, film-making and visual effects. I need a place to work to create my artistic designs, and I can't do that effectively when I don't have a permanent place to work on this.

28. I have earned money from this passion of mine. I earned $4000.00 for my work on a short film with a working title of *Supernatural Killers* in 2009. After that, I earned a total of approximately $12,000 until 2013. I also posted samples of my work to YouTube, for which I was paid about $100 from 2012 – 2014. Since 2014, I have not been able devote time to this craft because I don't have a suitable place to do it.

29. Credit One has always known that it had no evidence that I opened the account, yet it refused to fix it. Even when I made disputes the way I was supposed to through the credit reporting agencies, it knew. This fact that they know I am not responsible for the account, and yet they refuse to correct it, causes me to experience anger, frustration and inconvenience.

30. It has been inconvenient and frustrating because I have had to find lawyers to help me, and it wasn't easy. It is not obvious that you have to dispute directly to the

consumer reporting agencies instead of wasting time with Credit One Bank, who won't fix it no matter what.

31.     I have lost countless hours of sleep worrying about Credit One Bank and its refusal to correct the account. It's made me tired, including at work where I really need to be at my best. I have felt sick to my stomach when I think about the stress that I am under as a result from the Credit One report. It has obviously affected my relationship my mom. Even though my mom signed an affidavit stating that she was responsible, everytime Credit One Bank verified the account and refused to correct this, my stress and anger level increases.

32.     I have wanted to get my own place to live and get on with my life, but I haven't been able to do that. My anger, frustration, sleepless nights and feelings of sickness have not only continued, but have increased and every day that Credit One persists in reporting this trade line.

33.      The inability to correct this obvious identity theft that my mother admitted to makes me feel even more demoralized. Even when I proved I am not responsible for the account, I still could not get a decent place to live, obtain a credit card, a car loan, or a small loan to improve my land.

34.     This whole experience has caused me so much stress, I have wondered when and how I will have a future. I have felt angry and scared that someone like Credit One Bank could have taken control like it did, ruin my credit, and intentionally refuse to do anything to correct the mistake.

Signed this 21 day of September, 2016, in Newport News, VA.

David wood